Good morning, Your Honors. I'm Larry Spokoiny, appearing for Plaintiff Elizabeth Spokoiny, who is present in the courtroom today in the back left. I want to thank you all for giving us our day in court. It's been a little more than three years since this case has been filed and this is the first opportunity to appear in court. I'd like to reserve five minutes for rebuttal. Thank you very much, Your Honor. If you have any questions, please feel free to ask any. As you know, this case has a de novo standard of review and I just want to start with a few points and again, feel free to interrupt me at any point. We had submitted a 28-J letter on some new case law that had appeared. It came in right at the end of the reply brief, so I apologize I didn't catch it before I submitted that, but it's the Okinawski case, Okinawski v. Garland, which is pertinent to the issues at hand here. Okinawski v. Garland stands for the proposition that Title VII requires analysis of totality of the circumstances in a sex discrimination case. So you look at the direct sex-based discrimination, but you also look at the non-sex-based discrimination that accompanies that, such as bullying, which we had in this case. Also, the other main factor in Okinawski was that a prompt, thorough investigation and appropriate remedial remedies are required. And in the instance case, Ms. Spicone reported an incident of sexual harassment by a radiologic technician and immediately the employer went into a secret meeting about Ms. Spicone and they investigated her and they accused her of making false statements. So that was not a proper investigation. There was no action taken against the harasser whatsoever. He was allowed to resign. As I review the materials, I'm sure you have a bunch of questions. I have a few questions that I would like to pose rhetorically here. Why is just cause immaterial? The state writes that just cause doesn't matter, but that is the schematic for discipline used at the university. I understand it's probably an issue of first impression in the circuit. I wasn't able to find any cases on just cause, and it could be because most of the time it comes up in arbitration, but as you know in Washington, employees are not bound by arbitration. So just cause should matter. The discipline enacted should meet the just cause standard, and it did not here. Second question I have is why, as the state says, is unforeseeable FMLA leave not covered? That's contrary to the case law. Again, it may be an issue of first impression in this circuit, but there's a Washington State appellate case, Espindola v. Appelking, which specifically addresses the fact that unforeseeable leave has to be accounted for. In the University of Washington's own FMLA sheet, they did indicate also that FMLA, unforeseeable leave would be covered under FMLA. Obviously you can't tell anybody in advance about something that's unforeseeable. My third question is what is the good of having workplace accommodations if you're not allowed to use them? And in this case, there were workplace accommodations put in place, but Ms. Spicone was regularly denied the use of them. They were in one set of part of the clinic, but when she had to work with patients, there was no accommodations present. What exactly was the accommodation that was denied to her? There was a sit-stand desk that was used, and there was also adequate  So, Ms. Spicone, the disability has to do with a pre-existing vision disability, is that right? That's the disability? There are multiple disabilities. There's a pre-existing vision disability that predated... Okay, and I guess my question is that we're sort of jumping around on issues here, but in terms of the accommodation question under the Americans with Disabilities Act, from the record it appears that there were accommodations made, but you essentially are contending that it took too long to make them? Is that your argument or what? Are you contending that no accommodations were made? No, I'm not contending that. What I'm contending is that there were accommodations provided, but Ms. Spicone was prevented in her use of them in the clinic operations because they were only set up in the back room, and if she had to work in the front room, there was no accommodations. And so, when you ask about the accommodations, vision was one of them, but there was also shoulder injury, and there's also a long-standing autoimmune problem, and plus there were migraine headaches as well that required the use of a specific device that actually went on Ms. Spicone's forehead, so it couldn't be... It looked weird when it would be out in front of patients, so she needed that area to be able to use those accommodations. So, we're not denying that there were accommodations. Really, so the record is quite clear from what I understand. As to all of these, all of these accommodations were made as to every one of the disabilities. The contention is that they were improperly delayed at some point in time. There was a delay between November of 2019 to January 2020, where you see the human resource person apologize for the delay. Basically, you had a delay of two months. November 19 to January of 20, you have a two-month delay, and the accommodation is made, and your contention is that it was an unreasonable delay. Well, the main contention is the lack of use of... That's one of the contentions.  But the main contention is the inability to use the accommodations on a regular basis. The problem that I have just generally, not just with this claim, but with all of your claims, is that you don't really point to record evidence that would establish the issue. There's a lot of broad brush. Well, this is one of many complaints, but that makes the district court's job, and frankly, our job, very difficult, because you have to point to record evidence that supports that. So, as to the accommodations, I am appreciating, I think, for the very first time, despite having reviewed all the records in this case, like what your claim really is, and now we'll have to go back and see if there's record evidence to support that. So, that's just kind of a general problem that I have with all of your claims, frankly, because you don't cite to the record evidence that supports that. I believe we did cite to the... I mean, I've checked all the references in the brief, so I do believe that there are references. There's also certain sections that are quoted in there. But yeah, I do agree with you that there's a lot of material in this case, and we have more issues than some of the other cases that are presented. But, I mean, there's a whole string of correspondence related to the accommodation issue that is in the materials, and does end with the human resource person apologizing for the delay. So, they're So, the best... Is the best record evidence to go back to her declaration on these claims? No, I think there's plenty in the emails as well. I mean, the declaration, of course, covers a pretty comprehensive amount of it. It was also covered in the deposition itself, but there's also quite a bit of email information on the... Right, some of which she referenced in her declaration. Correct. Counsel, if I could ask you a question. There are many claims asserted. It would help me to understand what you consider to be your strongest claims. Okay, well, I think the sex discrimination, the retaliation is pretty obvious under the analysis of Jackson versus Birmingham, which is the U.S. Supreme Court case, which says the retaliation against the person filing a sex discrimination complaint is intentional discrimination. The secret meeting that was reported the sexual harassment turned into an investigation of her. So, I think that's a strong claim. The disability discrimination claim, I think, is also quite clear that... And again, you have to look at all the circumstances in these kind of cases, but she was regularly questioned on her use of FMLA, and the managers were saying, well, it doesn't meet department standards, or it's not convenient to us, or you didn't give us enough time, or if you woke up with a headache this morning, it's too bad you still have to come in. So, I think that that one is shown by the record as well. I hope I answered your question. Did you have a follow-up question on that? I just want to cover a couple other points real quick, and then I'll sit down here. My next question is, should the state be permitted to hide the ball by delaying public records requests? As shown in the record, one of the requests took almost 1,200 days for a full response, and it was only responded to at the tail end of discovery. I mean, it wasn't really directly responded as a public records request. The other one, which consisted of one person's file... Well, the record reflects that she made her request, in terms of this delay, that she made her request in the middle of the COVID-19 pandemic crisis. Are we to ignore that? I don't think the COVID crisis... Well, I'm looking in terms of... I know that you're contending that some of the record productions were slow and spanning multiple years, but some of these requests were made right in the middle of the COVID-19 pandemic. And this court, or at least the Washington State Court, has previously dealt with the issue of unreasonable delay in the context of the issues as to the pandemic. You contend that that was not a factor here or should not be considered? Well, I mean, I'm looking at the Yusufian series of cases. There's actually six of them. I'm studying the Conklin case, just so you know. Well, the Conklin case is an unpublished case that has no precedential value, but if you want me to talk about... It's not an unpublished case. It's a state appellate case, to my knowledge, that was published in 2023. But the Conklin case is not a published case. Well, I guess we'll have to find out, won't we, I guess? It's 100% an unpublished case, and it's an extremely broad request, where our request was narrow. Well, Bob, I'm going to have too much of your time, because you said you wanted to reserve some time. The bottom line on it is the COVID-19 pandemic is not a factor, as far as you were concerned, in response to Judge Wynn's question. I mean, I don't think it's a factor to make it 1,200 days. Okay. Okay. All right. And if you want to say it's a factor for 100 days, then I'll abide that argument. And the final point that I have is, are there grounds for an employer to refuse to pay documented wages? Ms. McHoney documents, and the Wisna v. Sacred Heart case shows there was a problem with nurses, that nurses were denied breaks. It holds for the proposition, if you're denied a break, even though you're paid for the break, you're allowed extra pay for the break, potentially even over time. If you don't have any other questions, I'll reserve the rest of my time. Okay. Thank you, counsel. Thank you. Okay, we'll hear from the appellee, please. Good morning. Good morning. May it please the court, Janie Freeman, I represent the University of Washington, who was the defendant below and is appellee here. In this case, the university is asking this court to affirm Judge Robart's order dismissing Dr. Spicone's claims on summary judgment. As is evident from the trial court's ruling, the judge applied the appropriate legal standards to each of Spicone's claims, and appropriately considered the evidence and the facts that Spicone presented in opposition to summary judgment. The trial court made the correct decision, applied the correct legal standards, and this court should affirm that decision. This case, despite the number of claims that plaintiff has thrown out there, that we've tried to address each one and tried to organize it in a fashion so that we can make sure we're dealing with the correct legal standards, is actually really pretty simple. It involves an employee, a nurse who was working in a medical center to provide patient care, clinic managers who were obligated to supervise the nursing and other staff and ensure smooth operations of that clinic while they provided medical services, and an employee who made it pretty clear consistently that she disagreed with and would not consider any feedback from her supervisors about clinic operations, any potential concerns about her performance, even when it came in a constructive fashion or a cooperative fashion, even when it came in the form of simply setting out reasonable expectations that not only applied to Ms. Spicone at the time, but to her co-workers as well. The plaintiff has, in the trial court and also on appeal, completely ignored the actual legal standards that apply. As the trial court went through the analysis of each of Dr. Spicone's claims, he set out that the bulk of the claims really, in terms of disparate treatment and retaliation claims that fall under the various statutes, like Title VII, RCW 4960 under state law, Title IX under federal law, these collectively are analyzed under the McDonnell-Douglas burden shifting standard, and that's significant because we really need to start there when we analyze each of these claims. That really wasn't briefed that way, so it made the district court much more difficult, but let me focus on the sexual harassment and ask you a question about that. The district court basically held that because the record evidence showed that Mr. Wilhelm resigned, it was the day after the employer first learned of the sexual harassment, so therefore there was really nothing more that the medical center could have done. So as I'm looking at the records to see whether there was any prior knowledge on the employer's part, there is a declaration that references the fact that she had been complaining about harassment from Mr. Wilhelm to Ms. Sarabia and her predecessor, Julie Waldhausen, for many months. I don't know what that paragraph references. Can you help me with that? Sure, I absolutely can. So what's very clear from the record is the specific instance of alleged sexual harassment conduct from Mr. Wilhelm occurred in August, at the end of August of 2019. He made a comment to her that she immediately reported to her manager, Ms. Sarabia, and then that manager immediately reported it to Mr. Wilhelm's manager, and he quit apparently that day. Ms. Spicconi's declaration... If I can, Mr. Freeman, hadn't they cited that there is an email in June of 2019 that complained about Mr. Wilhelm's physical intimidation and that there was some kind of mediation between Mr. Wilhelm and Ms. Spicconi, correct? Correct. In June of 2019. Yep. And was that sexual in nature in terms of complaint about sexual pressure or something? I don't understand the nature of what that was. No, and I would encourage you to look at the copy of the actual email. So in 2019, the interpersonal disputes between Spicconi and Mr. Wilhelm stirred up in April of 2019 when he issued a memo to all of the nursing staff that Ms. Spicconi refers to as a manifesto, and in that email, he was addressing nursing procedures and in coordination with other techs in the department, and he made a number of suggestions from his perspective as a radiology tech, and those included things like he was concerned that nursing staff was sometimes interfering with the x-ray equipment when he was trying to operate it. He wanted to set out or kind of come to agreements on some standards about getting patients ready and communicating with patients, etc. So that occurred in April, and actually the next month or so, an incident occurred where that one of those concerns came to fruition where Ms. Spicconi, being the nurse in the room, actually stepped on a CT scanner and ended up triggering it when there were patients and staff in the room, and so Mr. Wilhelm sent another email of concern addressing that. In the meantime, Ms. Spicconi said she was offended by the memo, and they were having to back and forth exchanges, and that led to how they interacted with each other. She was offended that he confronted her in front of a patient. He was offended that she laughed about it, and so the manager sat down with the two to discuss expectations of how we can interact in the room, etc., and so the other evidence we see, for example, with this concern about where nurses stand in the procedure room directly ties to the concerns that he was raising as a radiology tech. But no sexual context. No sexual content whatsoever. But the only evidence of sexual harassment came the day before the resignation? Yes. And what is this, I was complaining about harassment in the months prior to that, referring to? So Dr. Spicconi is referring to her email exchanges with management regarding Mr. Wilhelm's manifesto. The one leading up to the mediation. The one leading up to the mediation, and then also in the next month in August, both with regard to this manifesto and ongoing interpersonal interactions, it didn't just involve Mr. Wilhelm. Ms. Spicconi at the time said that another medical assistant, Mandy Garcia, a woman, she felt was also behind the manifesto, and she continued to have interpersonal conflicts with that employee as well. And so we see those communications really consistently from June, July, August of 2019. We see evidence of her manager sitting down with her and encouraging her to, you know, here's some suggestions on how to interact with your co-workers. Here's how you're perceived. Here's how they perceive you. And mutually actually outlining expectations for both sides. Well, then there's some contention that there were complaints leading up to August of 2019 regarding Mr. Wilhelm forcing her to watch wrestling tapes. What is that all about? So, after... Is there sexual content as to the wrestling tapes? Not that there is any record of. So let me explain where that comes from, though. So nothing about wrestling tapes or any other interactions with Mr. Wilhelm came up prior to August of 2019. Mr. Wilhelm resigned in September of 2019. We all agree about that. About... Right. So fast forward to January of 2020 when Ms. Bacconi was receiving her performance evaluation, and that's kind of the crux of her complaint is how she views her performance evaluation. On the day she was going to be getting her performance evaluation and had been notified that there would be the same concerns that had been communicated to her the summer before would also be included in her performance evaluation, she sent an email on January 9th of 2020, and she outlined suddenly about 10 different concerns spanning all the things we see in this lawsuit now. And at that time she said, oh, and by the way, back in 2018, two years earlier... 2019 or 2018? 2018. Okay. Back in 2018, two years ago, that guy Wilhelm, who no longer works here, said something else to me and also used to show wrestling videos. So that was... So she brought that up then. Mr. Wilhelm no longer worked at the university. Nonetheless, the head of the entire human resources department, Jennifer Patrice, immediately, that very day, set up a meeting with Ms. Bacconi, met with her to go over all these concerns, conducted her own investigation. And one of the things she specifically was looking at, because Mr. Wilhelm wasn't in the workplace anymore, she nonetheless continued to conduct an investigation regarding whether anything like that had ever been reported to any of the prior managers. I mean, at this time, one manager had retired, Ms. Waldhausen. She talked to the managers who were still there. She also talked to Ms. Waldhausen, even though she had retired, because she was concerned in finding out whether or not Bacconi had reported concerns about showing wrestling videos or whether there was any sort of sexual conduct or content. And she was unable to find any suggestion that it occurred. Moreover, when I deposed Dr. Bacconi last year, she admitted that she didn't actually report those things to anyone back in 2018. So this came up after the fact. There would not have been anything that the university could do at that point more than what they did, which was to reasonably investigate whether they had missed something and whether there was something else that they might need to do with processes or whatnot, or if there's someone else that might, they might need to address any sort of a performance concern. Any more questions about that? I have a question. Yes. I have one question. My understanding was that she felt uncomfortable because Will was a very big guy or taller, bigger than she was, didn't tell her, sort of towered over her when they talked. Do I have that wrong? You are correct that that was part of what she raised in the summer of 2019 during these communications about when they had a mediation and when the managers were addressing interpersonal conflicts. And what came out of that was the managers then communicating to each of the parties, both to Mr. Wilhelm, letting him know, here's how you might be perceived by your coworkers. You do have a difference in size. So we want to make sure you're aware of that so that you, you know, in case that you, in case you weren't aware and you can, you know, here's some steps you should take. There were also expectations and feedback given to Ms. Spicone about tone of voice and how people perceive sometimes the way that interacts with people. And same with regard to Ms. Garcia, there was feedback given to each of them so that they would know how their coworkers were perceiving them. And so they could take reasonable steps to change their, their practices if necessary. And there were no more, that was in July, I believe it was June or July of 2019. And then there was nothing else reported about concerns with Mr. Wilhelm until a month later, he made a comment to Ms. Spicone along the lines of, I can see through your clothes. And she said he touched her on her shoulder and that was immediately reported and it was immediately reported to his manager. And then he immediately resigned and was never back in the workplace. So one of the, oh, sorry. I was just saying, thank you, counsel. You're welcome. The trial court actually dismissed this claim based on, it was kind of assumed this was that there was a sexual harassment, an environment of sexual harassment established and jumped to what the... It went in summary judgment, not dismissal. Sorry. As you said, dismissed, it was a summary judgment that was entered, correct? Summary judgment, yes. Skipped over the whole question even of whether the conduct that was reported does rise to the level of a severe and pervasive environment and got to the points that we've been discussing here. And that certainly is sufficient to affirm the court's ruling, but also the evidence presented here does not appear to rise to the level of actually establishing a severe and pervasive environment of a sexual nature. The district court did, in terms of the McDonnell-Douglas analysis, just ended at step one in terms of protected activity, correct? Yes. And might it have been to just finish the analysis in terms of the temporal proximity for the sake of argument, I guess. Right. So you're talking about the retaliation claim? Yes, the retaliation claim. He actually did address causation as well, but in any of the claims, he did not get past the prima facie case. Right. I understand. Yeah. And then again, the court could affirm his decision at the same level. But more significantly, the appellant has failed to address any parts of the McDonnell-Douglas burden shifting, which accepts the employer's legitimate non-discriminatory reasons for any employment action, adverse or not, and then requires the plaintiff to come back and point to specific evidence more than the prima facie case, not just the prima facie case. Plaintiff doesn't even attempt to do that here. In the trial court, the judge addressed protected activity, which because there are so many different statutes at issue here, I mean, one important point I'd like to make there is just that it's necessary to establish protected activity under the specific statute. And the different statutes require opposition activity, and it has to be opposition activity to protected conduct under that particular statute. So it's somewhat different with respect to each statute in the plaintiff's field. Protected activity here allegedly is August 2, 2019, and the poor performance review is the adverse action following in January 2020. Yes. Thank you. Thank you. Thank you, counsel. Now, Ms. Spicone, case. Thank you, your honors. I just have a couple minutes here, so I'm going to try to power through what I have here. If you're listening to the state here, presenting Ms. Spicone is kind of a schlub here that she needs to be given feedback, which is, as you know, is not defined. It's just called feedback. Much of what's presented here by the state has only come up within the briefing. It was never brought up in the workplace. There was never any feedback actually given. McDonnell-Douglas case essentially supports our claim. Any reason they're giving is just purely pretext, doesn't meet the just cause standard. I also want to point out that all of this, the retaliation here led to a bad, an unwarranted bad review. And analogous case here is Jin Liu versus Amway, which is a Ninth Circus case. In that case, Jin Liu had a 19% decrease on the performance review. Here, Ms. Spicone has a 46% decrease. And Jin Liu stands for that you shouldn't misidentify FMLA leave as personal leave. I also want to bring up Muldrow, which is a fairly recent U.S. Supreme Court case, which says that an adverse employment action just means some harm. I've got a few seconds here. Some of the reasons we don't have the complaints about the wrestling videos is that manager Julie Waldhausen's emails were destroyed. That would have contained quite a bit of that. These videos did have sexual content. They were people in very skimpy costumes, sometimes men fighting women. And so they were indeed sexual harassment. Do you have any questions for me at this time? Thank you very much. I'm not in judgment. No. Thank you. Thank you. Thank you, counsel. The Spicone case shall now be submitted. I just want to thank counsel on both sides of the case for your excellent arguments. They're really very helpful to the panel. And you will hear from us in due course. Thank you.
judges: GOULD, NGUYEN, Bennett